597 A.2d 1027

J. Thomas **MATTINGLY**

v.

**STATE of Maryland.**

**No. 2000, Sept. Term, 1990.**

Court of Special Appeals of Maryland.

Nov. 4, 1991.

Revised and Refiled Dec. 20, 1991.

188

Arnold M. Weiner (Mary E. Goulet and Hazel & Thomas, P.C., on the brief), Baltimore, for appellant.

Norman L. Smith, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., and Christopher J. Romano, Asst. Atty. Gen., on the brief), Baltimore, for appellee.

Argued before MOYLAN, ROSALYN B. BELL and HARRELL, JJ.

ROSALYN B. BELL, Judge.

J. Thomas Mattingly was convicted by a jury in the Circuit Court for Baltimore City of three counts of theft under Md.Code Ann., Art. 27, § 342 (1957, 1987 Repl.Vol.), and three counts of fraudulent misappropriation by a fiduciary under Md.Code Ann. Art. 27, § 132 (1957, 1987 Repl. Vol., 1991 Cum.Supp). On appeal Mattingly raises a number of issues, including:

—whether the trial judge gave an inadequate and incorrect instruction as to the defenses of "good faith claim of right" and "honest belief";

—whether the State impermissibly multiplied a single alleged act of theft into six charges and convictions, three for alleged theft and three for alleged misappropriation by a fiduciary;

—whether he was improperly convicted of misappropriation by a fiduciary under Art. 27, § 132 when, as he claimed, the funds had not "come into his hands" as a fiduciary; and

—whether he was deprived of a fair trial when the prosecutor, in rebuttal, made references to the fact that

Mattingly was a tax cheat and a person of generally bad character.

The six charges in this case all relate to contract payments Mattingly received from the State of Maryland as payment for three road construction projects. In the early 1980s, two companies with which Mattingly was associated, Mattingly Construction, Inc. and Mattingly Builders, a sole proprietorship headed by Mattingly's wife (collectively, the Mattingly Companies), entered into certain highway construction contracts with the Maryland State Highway Administration (SHA). All of Mattingly's projects were bonded by the Fidelity and Deposit Company (F & D), but it is the Allegany and Washington County paving jobs, designated A684, A685 and W786, which were the source of Mattingly's convictions and are central to this appeal.

In the spring of 1985, Mattingly informed F & D that he was financially unable to complete performance on the outstanding road construction contracts and was unable to pay his bills. This was due, in part, to interference Mattingly encountered in the performance of contracts, including the unavailability of previously available raw materials, the sabotage of heavy equipment, and threats to employees. Rather than place Mattingly in immediate default, F & D agreed to guarantee a $2.5 million line of credit at Maryland National Bank to enable Mattingly to complete the contracts. In return, Mattingly agreed that all remaining payments from the SHA on F & D bonded contracts would be paid directly to F & D as a surety. Ultimately, F & D poured between $9 and $10 million into the projects in an effort to complete the jobs and pay the labor and suppliers.

In October of 1985, the Mattingly Companies filed for protection under Chapter 11 of the United States Bankruptcy Code. Approximately one year later, Mattingly negotiated an agreement with F & D whereby F & D would pay Mattingly a portion of the receivables remaining on the State contracts in return for Mattingly's assistance in securing final payments from the SHA. Mattingly asked that F & D advance his share of the money to be collected on jobs

A684, A685 and W786 to cover the expense of pursuing the payments. F & D then advanced $20,000 to Mattingly Construction to cover A684 and A685, and $15,000 to Mattingly Builders for W786.

Through early 1987, contract payments were made by the SHA directly to F & D pursuant to letters of default which the Mattingly Companies had executed in 1985. On February 3, 1987, F & D advised SHA that Mattingly could negotiate final payments and pursue claims on behalf of F & D. No such negotiations would be final until F & D approved them. F & D also reminded the State that all payments were to be sent to F & D. By a letter dated February 17, 1987, SHA acknowledged F & D's instructions. Also, on February 6, 1987, the Deputy Chief Engineer of SHA prepared memoranda authorizing that the semi-final payments be made to F & D. Copies of these memoranda were sent to the Mattingly Companies and to F & D.

In February of 1987, notwithstanding F & D's instructions to the contrary, the SHA mistakenly sent payments on all of the defaulted jobs, including over $163,000 for jobs A684, A685 and W786, to Mattingly. Two checks arrived in the Mattingly Companies' offices. Mattingly retained the funds, depositing them into the respective operating accounts of the Mattingly Companies. When questioned as to why he deposited the checks, Mattingly stated that he had unresolved financial issues with the State and F & D, and believed that he "had a responsibility to his companies, creditors and others." On November 10, 1987, an official of F & D wrote to SHA, inquiring about the status of payments. The SHA examined the relevant records and determined that the funds had been sent to the Mattingly Companies. In the summer of 1988, after some negotiating between F & D and the SHA, the SHA issued a second payment to F & D on the same contracts.

Charges of theft and fraudulent misappropriation by a fiduciary were brought against Mattingly. The jury returned a guilty verdict as to all six counts. After denying

his motion for a new trial, the trial judge sentenced Mattingly to a cumulative total of 39 years, with all but one year of each sentence suspended, to run concurrently. Mattingly was also ordered to pay $163,000 in restitution and to perform 300 hours of community service work.

We affirm the convictions in part and reverse them in part, and vacate the sentences. We explain.

## JURY INSTRUCTIONS

■ Mattingly contends that the trial court committed two errors in its instruction on the "good faith claim of right" and "honest belief" defenses to theft. The first is that the instruction consisted of only the most perfunctory recitation of the statutory language embodying those defenses. Mattingly argues that the language is not self-defining and, while he requested the judge to assist the jury by defining the critical element of these defenses, the judge declined to do so.

Mattingly also claims the judge incorrectly narrowed the defenses, which are based on a subjective state of mind, thus eliminating altogether the defense that Mattingly believed he had the right to use the funds because his companies had valid set-offs against the State and F & D.

Md.Code Ann., Art. 27, § 343(c)(1) and (2) spell out two defenses to theft:

"(c) It is a defense to the offense of theft that:

"(1) The defendant acted under a good faith claim of right to the property involved;

"(2) The defendant acted in the honest belief that he had the right to obtain or exert control over the property as he did[.]"

In the case now before us, the judge in instructing the jury said:

"It is a defense to the offense of theft that the Defendant acted under a good faith claim of right to ... the property or in the honest belief that he had the right to obtain or exert control over the property as he did."

The judge's instructions, therefore, were an almost verbatim recitation of the statutory language. This Court has upheld the adequacy of such instructions. In *Pearlstein v. State*, 76 Md.App. 507, 517, 547 A.2d 645 (1988), *cert. denied*, 314 Md. 497, 551 A.2d 867 (1989) and *Cardin v. State*, 73 Md.App. 200, 219, 533 A.2d 928 (1987), *cert. denied*, 312 Md. 126, 538 A.2d 777 (1988), *cert. denied*, 488 U.S. 827, 109 S.Ct. 78, 102 L.Ed.2d 55 (1988), we held that the verbatim reading of the statutory language was sufficient and "not so technical or complicated as to confuse the jury, but instead was quite straightforward and lucid." *Cardin*, 73 Md.App. at 219, 533 A.2d 928.

Mattingly argues that under the holding in *Sibert v. State*, 301 Md. 141, 154, 482 A.2d 483 (1984), he was entitled to have the jury receive an explanation of the meaning of "honest belief." In *Sibert*, however, the judge gave no jury instruction at all on the honest belief defense. The Court of Appeals in *Sibert* held that, when there is enough evidence adduced during the course of a trial to generate a jury issue as to whether the defendant had on honest belief that he had a right to obtain or exert control over the property, a jury instruction on the honest belief defense is required. The Court of Appeals did not, as Mattingly claims, delineate the form the instruction should take; it merely stated when such an instruction was required.

Mattingly further contends that the trial court erred in instructing the jury that "before you may apply the concept of a good faith claim of right as a defense in this case you must find that the Defendant believes he had an entitlement to the monies in Contracts A684, A685 and W786." Mattingly complains that, with this instruction, the trial court effectively refused to allow consideration of the set-offs Mattingly believed he had against the SHA and F & D as a "claim of right."

We fail to see, however, how this additional instruction by the judge limited Mattingly's claim of right defense. Under the language of Art. 27, § 343(c)(1), the defendant must have acted under a "good faith claim of right to *the*

*property involved."* (Emphasis added). Here, the "property involved" was the proceeds from SHA contracts A684, A685 and W786. The judge, in denying the motion for a new trial, explained:

> "The way I phrased the instructions did not confine the Defendant's or [—] did not confine the Defendant's legal entitlement theory to that money. It simply said that he had to believe that he was entitled to that money. It made no reference to whether he was entitled to that money because it's money that should have come to him or money by virtue of a set off or a claim of some other sort. All it dealt with was whether or not he had an entitlement to the monies that were, in fact, received."

The trial judge was not trying to limit Mattingly's defense; he was merely trying to clarify for the jury which property, in this case the checks, was involved. We do not find that this prejudiced Mattingly's defense in any way.

## MULTIPLICITY AND MERGER

Mattingly next contends that the State impermissibly proliferated a single act of theft into three theft convictions and three misappropriation convictions. Mattingly argues that "this profusion of guilty findings cannot stand because it violates the Double Jeopardy clause of the Constitution of the United States; does violence to principles of fundamental fairness; contravenes Maryland common law principles relating to double jeopardy and transgresses applicable statutory mandates as to the proper unit of prosecution and the inclusion of embezzlement offenses in the crime of theft."

The State argues that Mattingly did not properly preserve this issue for our review. The State contends that at trial Mattingly did not request the court to instruct the jury that it could not find him guilty of both crimes nor did he take exception to the instructions the trial court actually gave. The State also claims that Mattingly did not request

that the court address or correct the allegedly inconsistent convictions. This is not, however, precisely correct.

At trial, when Mattingly moved for judgment of acquittal at the conclusion of all the evidence, the trial judge stated that he "treat[ed]" the renewed motion "as incorporating all of the grounds previously set forth." The trial judge said:

> "As I understand it, there were some arguments that had to do with whether or not the indictment was duplicitous. You've made those arguments. You don't have to make them in any great detail at this point. Because they have been presented, I'm aware of what your position is. I'll hear anything else you have to say regarding a motion for judgment of acquittal."

Mattingly then argued that he did not violate any fiduciary duty in receiving and depositing the checks. The prosecutor understood Mattingly's point for, in response, he asserted: "On the fraud and misappropriation counts, that the defendant was a fiduciary with regard to these funds, I think is amply set forth in the very documents that the defendant signed."

Mattingly's indictment charged him with a total of six counts. The first four counts of the indictment all related to the $90,644.11 check. Count I charged theft of $26,763.61 (for contract A684); Count II charged fraudulent misappropriation of the same $26,763.61; Count III charged theft of $63,879.50 (for contract A685); and Count IV charged misappropriation of the same amount. The last two counts stem from the second $73,134.46 check for contract W786. Count V charged theft of $73,134.46 and Count VI was for misappropriation of the same amount. On Count I, Mattingly was sentenced to eight years, with all but one suspended; on Count II, he was sentenced to five years, with all but one suspended; on Count III, he was sentenced to eight years, with all but one suspended; on Count IV, he was sentenced to five years with all but one suspended; on Count V, he was sentenced to eight years with all but one suspended; and on Count VI, he was sentenced to five years, with all but one suspended.

The Court of Appeals in *Brown v. State,* 311 Md. 426, 432, 535 A.2d 485 (1988), stated:

"Whether a particular course of conduct constitutes one or more violations of a single statutory offense affects an accused in three distinct, albeit related, ways: multiplicity in the indictment or information, multiple convictions for the same offense, and multiple sentences for the same offense. All three turn on the units of prosecution of the offense and this is ordinarily determined by reference to legislative intent."

In *Ball v. United States,* 470 U.S. 856, 864–65, 105 S.Ct. 1668, 1673–74, 84 L.Ed.2d 740 (1985), the Supreme Court held that both multiple convictions and multiple sentences come within the double jeopardy prohibition against multiple punishment for the same offense.

Mattingly argues that under the facts and the evidence presented in the case, he could only be convicted of one act of theft. We agree.

The money disbursed to Mattingly was made through a special manual payment system, which differed from the normal computer disbursements made by the SHA. At trial, Andrew Eisner, Chief of Vouchers Payable at the SHA, explained that the manual system is employed to expedite payments to contractors who are in need of a quick infusion of capital and cannot wait for the regular computer disbursement. Use of the manual system permitted the drawing of the checks to Mattingly's corporations. If processed in the normal manner, the checks would have been issued to F & D. Eisner testified that only about one percent of all SHA contract payments are taken out of the computer system for expedited payment.

Eisner testified that the manual disbursement system is triggered by a call from a contractor to Eisner's office. Eisner or a member of his staff then types the contractor's invoice information taken from the contractor's estimate form onto a list which goes to the State Treasurer's Office in Annapolis, where a check with a voucher is cut. The

check is then forwarded to the contractor and the voucher is sent back to Eisner's office where a manual voucher input form is written to be placed in the file. Eisner testified that the manual voucher input forms are written days or even weeks after the checks have been sent.

At trial, Eisner testified that, during the relevant time period, he received "several" telephone calls from someone named "Edie," who asked that manual payments be sent to Mattingly.[1] The manual disbursement system was then triggered and the State Treasurer's Office sent two checks, numbered 3757572 and 3757573, with voucher numbers 730975 and 730976, to Mattingly for the three contracts.

The State contends that each of the stolen contract payments was separately vouchered and separately processed by the SHA on an expedited basis. In addition, the State also contends that the evidence clearly implied that separate telephone calls were made with regard to each contract amount. This is not clear from the evidence.

The State was unable to establish, either through the use of Eisner's testimony or by any other evidence, exactly how many calls were made by Edie or any other member of Mattingly's organization to Eisner's office. In addition, there were only two vouchers with their respective checks issued. Both vouchers had the same date of issue, December 30, 1986. The two vouchers and checks had consecutive numbers, which indicate that they were issued sequentially and at the same time. The State's argument that there were three separate vouchers cannot be supported by the available evidence. There were three separate manual voucher input forms, but, as Eisner's testimony established, these could have been filled out any time after the official vouchers arrived from the State Treasurer's office. The evidence and testimony presented was not sufficient to

---

1. At trial, Mattingly admitted that he did have a secretary-receptionist named Edie Kalbaugh. While he denied ever having had her make such calls, the jury could make that inference.

sustain the State's burden to establish that Mattingly had, in fact, committed more than one act of theft.

■ Mattingly next contends that his convictions of both theft and misappropriation by a fiduciary are impermissibly inconsistent. He argues that even if misappropriation by a fiduciary could have been viewed in the abstract as a separate offense from theft, conviction for both offenses on the record of this case constitutes impermissibly inconsistent verdicts. We agree.

The Court of Appeals discussed inconsistent offenses in *State v. Jenkins*, 307 Md. 501, 517, 515 A.2d 465 (1986). Jenkins was charged with assault with intent to murder, assault with intent to maim, disfigure, or disable, simple assault and carrying a handgun. In *Jenkins*, the Court of Appeals upheld the findings of this Court that the intent element for assault with intent to murder was inconsistent with the intent element for the crime of assault with intent to maim, disfigure, or disable. The Court of Appeals explained that assault with intent to murder requires proof of a specific intent to kill under circumstances such that, if the victim dies, the offense is murder.

On the other hand, assault with intent to maim, disfigure or disable requires an intent to maim, disfigure, or disable, which are separate and distinct from an intent to murder. Intent to maim, intent to disfigure, or intent to disable all contemplate that the victim shall live. The intent to murder is different in kind, in that it contemplates the death of the victim. Thus, they are inconsistent. The Court of Appeals, held, however, that both of these intents could be harbored at the same time. The Court of Appeals said:

"Thus, in committing an assault, the perpetrator might intend that the victim die. At the same time, the perpetrator might have an alternate intent that, if the victim does not die, he at least be maimed or disfigured or disabled. The fact that the intents may be mutually exclusive does not preclude their being held as alternatives by the same person at the same time. The second

intent is held as a conditional matter, conditioned upon the first intent not being achieved. The criminal law recognizes the possibility of conditional and qualified intents."

To distinguish true inconsistent offenses, the Court of Appeals used the crimes of larceny and receiving stolen property as examples, stating:

"The reasons that offenses like larceny and receiving are deemed inconsistent in Maryland is not because the inconsistent intents may not be harbored at the same time. For example, a person may desire a particular item of property and intend to steal it; at the same time, realizing that he may be unable to steal the property, he may alternately intend to purchase it from someone else who steals the property. The inconsistent intents may coexist as alternatives. What renders larceny and receiving inconsistent offenses is the fact that both intents cannot be carried out."

*Jenkins*, 307 Md. at 516, 515 A.2d 465. The Court of Appeals recognized the fact that a thief cannot be guilty of receiving stolen goods because he has, in fact, stolen them. Likewise, a receiver of stolen goods cannot be the thief.

Here, Mattingly was convicted of stealing and fraudulently misappropriating the same money. As in the thief/receiver scenario explained by the Court of Appeals in *Jenkins*, key elements of the two offenses Mattingly is charged with are inconsistent and in fact are mutually exclusive. If Mattingly received the checks that SHA sent to him, believing that he was entitled to them, then he could not be a thief, but would hold the checks in a fiduciary capacity. If, on the other hand, Mattingly knew that he was not entitled to the money when he received it, he could not hold it as a fiduciary because he would be holding it as a thief.

In the instant case, Mattingly unlawfully retained the money from the SHA, to which he knew he was not entitled. Article 27, § 342(a) states:

"A person commits the offense of theft when he willfully or knowingly obtains control which is unauthorized or

exerts control which is unauthorized over property of the owner, and:

"(1) Has the purpose of depriving the owner of the property; or .

"(2) Willfully or knowingly uses, conceals, or abandons the property in such manner as to deprive the owner of the property; or

"(3) Uses, conceals, or abandons the property knowing the use, concealment, or abandonment probably will deprive the owner of the property."

Mattingly knew that he was not authorized to retain the money sent to him by the SHA, but rather knew that he was supposed to send it either back to the SHA or forward it to F & D. Instead of returning the money or sending it on, however, he retained the funds, placing them in the operating accounts of two of his businesses. He deprived the rightful owner(s) of the property. The jury was instructed on the good faith and honest belief defenses. Since the jury found Mattingly guilty of theft, it rejected those two defenses and found he had no right to the two checks. Given that finding, Mattingly could not be guilty of fraudulent misappropriation by a fiduciary, because he, in fact, had stolen the checks. His status as a thief preempts his status as a fiduciary. In the instant case, Mattingly's crime consisted of a single act of taking money at a particular point in time. Thus, we find that Mattingly is only guilty of the one count of theft.

Mattingly, also contends that under the "required evidence" test of *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932), the theft and fraudulent misappropriation by a fiduciary convictions merge. He also contends that the rule of lenity precludes the six convictions. Since we have found that in this case the two offenses are inconsistent, we need not address either the merger or lenity arguments.

## FIDUCIARY STATUS

On appeal, Mattingly attacks his convictions for fraudulent misappropriation by a fiduciary under Art. 27, § 132.

Mattingly claims that the checks from the State did not come into his hands as a fiduciary for F & D, since he only had "limited ... authorization" to act on behalf of the bonding company. This authority, he says, was confined to preliminary negotiations of certain contract issues. In addition, Mattingly contends that if he or the Mattingly companies had been fiduciaries, payments to any of them by the State would have been the equivalent of payments to F & D. He argues that this is inconsistent with the fact that the SHA was willing to make a second payment directly to F & D in 1988. Thus, he argues that the State had not met its burden of proving that he was a fiduciary.

Since we have already determined that Mattingly's status as a thief preempts his status as a fiduciary, we need not address these contentions.

## PROSECUTORIAL MISCONDUCT

Finally, Mattingly argues that his convictions must be set aside because of the misconduct of the prosecutor in making a "highly prejudicial and wholly inaccurate attack on the defendant's character in the course of his rebuttal argument." The rebuttal argument that Mattingly complains about went as follows:

"[STATE'S ATTORNEY]:

\* \* \* \* \* \*

Probably the single most ironic fact in this entire case, ladies and gentlemen, I would submit to you ... [is] 'that no Mattingly entity other than WOCAP [Mattingly's father's company] has filed federal tax returns since fiscal year 1984. He [Mr. Reineke, Mattingly's comptroller] also said that Tom and Sheila Mattingly [his wife], have not filed tax returns since 1985.'

"Now, I say that's ironic because the Defendant and his companies made their living through taxpayer funded jobs and yet he didn't even file his tax returns. This demonstrates, ladies and gentlemen—

"[DEFENSE COUNSEL]: Objection.

> "[PROSECUTOR]: —the true character—
> "THE COURT: I will sustain the objection.
> "[OTHER DEFENSE COUNSEL]: Thank you.
> "[PROSECUTOR]: —of the Defendant. He's willing to accept a benefit, but he refuses to accept the burden...."

In general, counsel has the right to make any comment or argument that is warranted by the evidence or reasonable inference drawn therefrom. *Wilhelm v. State*, 272 Md. 404, 438, 326 A.2d 707 (1974). The prosecuting attorney is free to comment legitimately and to speak fully, although harshly, on the accused's actions and conduct if the evidence supports his comments. *Wilhelm*, 272 Md. at 412, 326 A.2d 707.

The prosecutor in his rebuttal argument was referring to an exhibit—State's Exhibit 18, to be precise—which had been admitted into evidence without objection. This exhibit was a Cash Transaction Review of the Mattingly Group prepared by Ernst & Whinney. The report contained a statement that Mattingly had filed no income tax returns since 1985. No other evidence had been admitted that would contradict this statement. Even though the report was prejudicial, once it had been admitted without objection as an exhibit, the prosecution was free to comment upon it. Thus, no error was committed.

In addition, Mattingly's counsel received exactly what he had asked for. Counsel objected to the statement made by the prosecutor and the judge sustained the objection. Counsel did not move for a mistrial, although he did so later, but only after Mattingly had been convicted on all counts. At that point, however, it was too late, the opportunity had been waived. In denying the motion for a new trial the judge remarked:

> "My point is if it was that damaging it seems that you would have asked for a mistrial and in not asking for a mistrial it seems as though you have made a tactical decision that at that point in time you wanted to go

forward and let the jury make a decision even with this statement which the Court sustained the objection to.

\* \* \* \* \* \*

"Basically what I am suggesting to you is that on this record, absent plain error, it would seem that you have waived this issue."

■ We concur with the trial judge's conclusion of waiver. In addition, we do not perceive any prejudice created by the State's closing argument. Nor do we agree with Mattingly's contention that the judge had an affirmative duty to caution the jury to disregard the remarks. The judge stated:

"I make an affirmative finding that the statements were made during closing argument regarding the tax returns was not such a statement that would create the kind of prejudice that would require this Court to grant a new trial, and indeed I further make a finding that I personally believe that the verdict was not in any way affected or impacted by that statement that indeed the Court believes that the verdict would have been the very same had the statement never been made."

The trial judge, after having presided over the six-day trial, was in a superior position to assess the impact of the closing argument. We see no need to disturb his findings.

CONVICTIONS FOR THREE COUNTS OF FRAUDULENT MISAPPROPRIATION BY A FIDUCIARY AND TWO COUNTS OF THEFT REVERSED.

ONE CONVICTION FOR THEFT AFFIRMED.

CASE REMANDED FOR RESENTENCING.

COSTS TO BE PAID ONE–HALF BY APPELLANT AND ONE–HALF BY MAYOR AND CITY COUNCIL OF BALTIMORE.